IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
Martinsburg

**DANIEL BARNES**,

      Plaintiff,

      v.                                    Civil Action No. 3:10-CV-72
                                                          Judge Bailey

**THE HARTFORD LIFE AND
ACCIDENT INSURANCE COMPANY**,

      Defendant.

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Pending before this Court is Defendant Hartford Life and Accident Insurance Company's Motion for Summary Judgment (Doc. 21). The plaintiff filed his response (Doc. 23) on August 17, 2011, and the movant filed its reply (Doc. 24) on August 31, 2011. Defendant Hartford Life and Accident Insurance Company ("Hartford") filed a motion to strike plaintiff's exhibits (Doc. 25) on August 31, 2011, which motion was granted on September 7, 2011 (Doc. 27). On September 29, 2011, the plaintiff filed a motion to reconsider this Court's September 7, 2011, Order (Doc. 28), which was denied by Order entered October 18, 2011 (Doc. 29). This motion for summary judgment is now ripe for decision.

**I.  Factual Background**

Plaintiff was employed full-time by Fireline Corporation ("Fireline") as a design engineer from April 12, 1999 to February 2, 2001. As a former employee of Fireline Corporation, the plaintiff was a participant in the Group Benefit Plan ("Plan") for its

1

employees, which provided Long-Term Disability ("LTD") benefits to eligible and qualified employees pursuant to the terms of a policy of insurance issued by Hartford ("Policy") (Doc. 21-1). Under the Policy, a person who is disabled from his or her own occupation may receive benefits for 24 months. Benefits may only continue if the person establishes that he or she is disabled from any occupation (Id., p. 008).

The Policy further provides that, "[w]hen making a benefit determination under the policy, [Hartford has] discretionary authority to determine *Your* eligibility for benefits and to interpret the terms and provisions of the policy." (Id., p. 006).

Plaintiff ceased work on February 2, 2001 and, thereafter, submitted an application for LTD benefits to Hartford with an accompanying Attending Physician's Statement of Disability ("APS") signed by Richard A. Berg, plaintiff's treating infectious disease specialist. Dr. Berg wrote that plaintiff suffered from hepatitis and diabetic complications, with side effects of jaundice, weakness, depression and anxiety. (Doc. 20, pp. 1643-1645).

Hartford approved his claim effective May 3, 2001. (Id. pp. 1610-1611). Over approximately the next two (2) years plaintiff generally worked part-time and underwent treatment for a variety of complaints. (*See e.g.*, Doc. 20, pp. 1373-1374, 0341, 1480, 1623-1626, 1614-1618, 1906SIU, 1509-1510, and 1515). In August, 2003, the plaintiff ceased work altogether.

Plaintiff also began some treatment for psychological complications. Due to his excessive use of medications for pain and his unsupported but increasing fears that he would experience worsening symptoms from HIV (with which he had been diagnosed in 1986) (Id., p. 1452) and die, plaintiff underwent a Psychiatric Evaluation with Stanley R. Platman, M.D., on November 26, 2002. (Id., pp. 1450-1452). Dr. Platman believed

plaintiff's psychiatric diagnoses included major depression and opiate dependence (plaintiff was addicted to Oxycontin). (Id., p. 1451). Dr. Platman recommended treating plaintiff's depression with medications and deferred efforts to treat the Oxycontin addiction. (Id., p. 1452).

As of May 3, 2003, after receiving LTD benefits for twenty-four (24) months under the "Own Occupation" standard, the Policy required that plaintiff be unable to perform the material and substantial duties of any occupation in order to continue receiving benefits beyond that date. (Doc. 21-1, p. 8). Hartford determined that he had submitted evidence sufficient to satisfy this requirement. Additionally, Plaintiff was awarded Social Security Disability ("SSD") benefits by the Social Security Administration ("SSA") effective January, 2004. (Doc. 20, p. 1405).

The plaintiff treated periodically with Drs. Berg and DeBond between 2003 and 2005. Plaintiff's treatment with these physicians apparently ceased altogether between July 2005 and the Summer of 2006. (Id., p. 1305). On July 10, 2006, plaintiff saw Mark Galbraith, M.D., infectious disease specialist, for treatment of his HIV and associated conditions. (Id., pp. 1118-1119). Plaintiff's records began to reveal substantial improvement in his condition. His treatments with Dr. Galbraith revealed that his HIV, peripheral neuropathy with tremor, osteoporosis and diabetes all were controlled, but he was experiencing some gastrointestinal problems, chronic pain and depression. (Id., pp. 1118-1119, 1116).

Although plaintiff was diagnosed with Irritable Bowel Syndrome ("IBS"), based on his continual complaints of abdominal pain, extensive testing showed no abdominal abnormalities. (Id., pp. 1114, 1109, 1128, 1102, 1095-1097, 1077-1078). Similarly, plaintiff also complained of fatigue in February, 2007, but his blood work was unremarkable. (Id.,

p. 1114). In October, 2007, his HIV remained under control. (Id., p. 1880SIU).

The plaintiff's claim was referred to the Special Investigations Unit of Hartford on August 24, 2007. Surveillance of the plaintiff was conducted on four days in September and October, 2007. On one day, the plaintiff did not leave his home. On the other days, surveillance revealed the plaintiff away from his house for up to two (2) hours and fifteen (15) minutes at a time, during which time he was observed driving, jogging across the street, smoking without tremors and carrying two (2) half full bags of groceries, among other activities. (Id., pp. 1855-1856SIU). At his home, plaintiff was seen watering/spraying his lawn on two separate occasions, once for fifteen (15) minutes, while he carried a chemical pack on his back and squeezed a sprayer multiple times, also without tremors. (Id., pp. 1856SIU, 1860-1861SIU). During all of the activities, including bending and squatting, plaintiff moved in an apparent normal and unrestricted manner without braces or aids, and with an upright posture with no visible tremors or deficits in his hands. (Id., pp. 1900-1901SIU, 1853, 1858).

Plaintiff was interviewed by a Hartford representative on November 28, 2007, and shown the surveillance footage. He confirmed that the level of activity revealed by the surveillance accurately represented his normal level of functionality. (Id., p. 1913SIU). The interviewer reported that during the three (3) hour interview, plaintiff moved throughout his home without any observable restrictions or pain indicators, and he appeared to have full use of his hands and fingers. (Id., pp. 1904-1905SIU). Plaintiff described his disabling conditions as HIV, nausea, fatigue, projectile vomiting, bowel incontinence almost daily, gastroparesis, severe abdominal pain, and neuropathy of his upper and lower extremities. Plaintiff further reported that HIV reduced his endurance which impaired his ability to

function, and a femur fracture he had experienced in 2001 caused residual chronic daily pain requiring occasional use of a cane. (Id., p. 1906SIU). Plaintiff advised that his only treating physician for his physical condition at that time was Dr. Galbraith, an infectious disease specialist. (Id., pp. 1906-1907SIU).

On September 27, 2007, plaintiff began treating with Heidi Lucas, a psychotherapist, following his admission to a rehabilitation facility from September 18 through 25, 2007 for opiate and sedative-hypnotic dependence. (Id., pp. 898, 887, 848-853). Ms. Lucas decided to treat him in an outpatient program, focusing on grief issues, depression and staying clean. (Id., pp. 850-853). Plaintiff continued seeing Ms. Lucas throughout the remainder of 2007 and into 2008. (Id., pp. 786, 765-767, 777, 757, 809-815). Ms. Lucas's records revealed that even plaintiff recognized the substantial change for the better in his condition. On January 15, 2008, plaintiff informed Ms. Lucas that he was considering returning to work and that he had begun researching career options. (Id., p. 757).

Hartford wrote to plaintiff's treating physician Dr. Galbraith, plaintiff's infectious disease specialist, on December 13, 2007, summarizing plaintiff's November 2007 interview. Hartford also forwarded the surveillance footage, and asked whether Dr. Galbraith agreed with Hartford's conclusion that plaintiff now was capable of full-time work. (Id., pp. 1007-1009). On December 18, Dr. Galbraith confirmed that plaintiff likely could perform full-time sedentary level work from a physical perspective, but noted that plaintiff's cognitive condition may preclude him from doing so. (Id., p. 1915SIU). Dr. Galbraith raised the prospect of plaintiff undergoing a neuropsychological test which would be required to confirm his suspicion. (Id.). Dr. Galbraith suggested that Hartford (rather than he) would have to perform this testing. (Id., p. 1869SIU). Hartford did not require plaintiff to undergo

these tests, and plaintiff never submitted any such testing in support of his claim.

In January, 2008, without the benefit of the testing he had suggested previously, Dr. Galbraith wrote to Hartford explaining that, while he still believed plaintiff was physically capable of performing full-time sedentary level work, he did not believe plaintiff was capable of such from a cognitive and neuropsychiatric standpoint. (Id., pp. 1008-1009, 1877SIU). According to Dr. Galbraith, plaintiff had chronic fatigue, lack of endurance, poor stamina and an inability to concentrate or focus. (Id.). Dr. Galbraith again recommended a neuropsychiatric evaluation for plaintiff, (Id., p. 1878SIU), but plaintiff never had such testing performed.

On March 17, 2008, plaintiff advised Hartford that he was terminating treatment with Dr. Galbraith because the latter had failed to accommodate plaintiff's need for an appointment. (Id., p. 857). Plaintiff also felt that Dr. Galbraith was treating him differently since having seen the surveillance footage. (Id., p. 1917SIU). Plaintiff planned to begin treating with Dr. Anthony Owunna, an internist. (Id., p. 857).

Accordingly, on March 18, 2008, Hartford sent the same letter and surveillance footage to Dr. Owunna that it previously had sent to Dr. Galbraith, asking whether Dr. Owunna believed plaintiff was capable of full-time sedentary or light work. (Id., pp. 798-800). Dr. Owunna did not respond. Instead, on June 18, 2008, plaintiff wrote to Hartford advising that Dr. Owunna would not confirm or deny plaintiff's disability status based only on the surveillance footage. Moreover, plaintiff claimed Dr. Owunna was at a disadvantage to make a medically sound decision because plaintiff's other treating physicians failed to forward his medical records. (Id., p. 656). Plaintiff instead requested Hartford contact Dr. Berg, whom he had last seen in May, 2004, regarding plaintiff's

functional capabilities. (Id., p. 656).

As plaintiff had requested, on June 24, 2008, Hartford forwarded the same letter and surveillance footage to Dr. Berg that it had previously forwarded to plaintiff's other treating physicians and asked whether Dr. Berg agreed that plaintiff was capable of full-time sedentary or light work. (Id., pp. 641-643). Dr. Berg responded, indicating that he had seen plaintiff only once in the last four (4) years and was unable to make any assessment as to his work ability. (Id., p. 634).

Thereafter, Hartford requested an Independent Medical Review ("IMR") from John L. Brusch, M.D., Board Certified in Internal Medicine, Geriatric Medicine and Infectious Disease, and Patrick L. Lillard, M.D., Board Certified in Psychiatry & Neurology/Psychiatry. Each doctor was asked to opine on plaintiff's functional capabilities and work ability from the standpoint of their specialties. (Id., pp. 697-698). Drs. Brusch and Lillard were asked to review all the plaintiff's medical records submitted to Hartford.

In his report, Dr. Brusch noted that plaintiff had normal examinations and had no gait disturbance, no psychiatric symptoms, no bone/joint symptoms or weakness and no documentation of neuropathy except that it was included in the lists of his diagnoses. The surveillance footage showed no observable abnormalities, and plaintiff showed the ability to stand for a prolonged period, drive, use a garden sprayer in both hands, twist, turn, squat and carry. Plaintiff had no pain indicators during his interview, he had a good range of motion, and he could sit for forty (40) to fifty (50) minutes at a time with full use of his hands and fingers and normal reaching abilities. (Id., p. 651).

Dr. Brusch also spoke with Dr. Owunna regarding plaintiff's condition. Dr. Owunna reported he had told plaintiff "directly that he could not support the disability claim of

7

[plaintiff]. Physically, the claimant has a normal examination. His HIV is well-controlled. He had seen a copy of the surveillance footage and stated that the claimant looked perfectly fit." (Id., p. 650).

Dr. Brusch concluded that plaintiff was able to perform light duty work on a fulltime basis. He believed plaintiff could stand and walk for four (4) hours each and sit for eight (8) hours per workday with the ability to change positions. Dr. Brusch further concluded that plaintiff easily could carry, lift and push up to ten (10) pounds frequently and up to twenty (20) pounds occasionally. (Id., p. 651).

Dr. Lillard, who reviewed plaintiff's condition from a psychiatric perspective, also believed him to be capable of full-time work. Dr. Lillard noted that, since the initial visit with Ms. Lucas on September 27, 2007, plaintiff had followed-up with her every two (2) to four (4) weeks without indication of significant distress or crisis. Plaintiff had never manifested psychotic features and there were no documented signs or symptoms of severe depression. Dr. Lillard further noted that there was no documentation of impairments from a psychological perspective that would dictate restrictions or limitations, and no documentation of cognitive impairment. (Id., p. 646).

Dr. Lillard was unable to contact Ms. Lucas, but he spoke with plaintiff's treating psychiatrist, Dr. Kahn, who said plaintiff was being followed for depression and the major problem was his anxiety, in particular anxiety about returning to work. While Dr. Kahn did not believe plaintiff could return to work, he did not provide any specific signs or symptoms that would impair him from work. (Id., p. 647).

Dr. Lillard also spoke with Dr. Owunna who advised that he had seen plaintiff only three (3) times and during each of those visits plaintiff appeared very anxious and

depressed and complained of chronic fatigue. Dr. Owunna was uncertain if plaintiff had an active psychological impairment that would cause restrictions or limitations. (Id., p. 647).

Based upon all of this evidence, Dr. Lillard concluded there were no impairments from a psychiatric perspective that would support limitations or restrictions on plaintiff's ability to work, and no documentation of a psychiatric or cognitive disorder that would impair, limit or restrict plaintiff. (Id., p. 647).

Thereafter, Hartford requested that Marvin S. Bryant, M.S., C.R.C., Vocational Rehabilitation Counselor, provide an Employability Analysis Report ("EAR") to determine whether there were any occupations within the local economy available for plaintiff given his functional abilities. (Id., p. 619). Mr. Bryant used the Occupational Access System ("OASYS"), which is a computerized job matching system that cross references an individual's qualification profile with 12,741 occupations classified by the U.S. Department of Labor in the 1991 Dictionary of Occupational Titles. (Id., p. 590). The EAR considered plaintiff's functional capabilities and restrictions as defined by Drs. Brusch and Lillard, as well as plaintiff's education, training and work history. (Id.). The EAR identified at least three (3) sedentary to light level occupations available within the local geographic economy for which plaintiff was qualified and capable of performing and that met the required wage earnings under the Policy. (Id., p. 591).

On July 25, 2008, Hartford advised plaintiff that it had determined he no longer met the Policy definition of disabled beyond July 23, 2008. By letter from his counsel dated January 20, 2009, plaintiff appealed Hartford's benefit determination. (Id., pp. 469-470). Accordingly, Hartford began an independent investigation of plaintiff's claim on appeal during which it obtained reports from two (2) more Board-Certified physicians, Rosaline

Vasquez, M.D., Board Certified in Internal Medicine, and Melvyn Lurie, M.D., Board Certified in Psychiatry. (Id., p. 429). Hartford also made several requests to plaintiff for any recent treatment records from his treating physicians since its initial denial determination. These documents were never provided, and Hartford proceeded with the appeal review with the documents already on file. (Id., pp. 455, 451, 435).

     Dr. Vasquez spoke with Dr. Berg who advised that he no longer was treating plaintiff and had seen him only one time in the past four (4) years when plaintiff requested that he write a letter of disability for him. (Id., p. 423). Dr. Vasquez evaluated each of plaintiff's claimed disabilities and discounted them one by one. She confirmed that plaintiff's HIV and diabetes diagnoses did not require functional restrictions. (Id., pp. 423-424). She noted that plaintiff's last episode of hepatitis was in 2001, and his liver function tests had been normal since 2002. Although plaintiff complained of symptoms related to osteoporosis in the past, the record did not show any ongoing issues with chronic pain from this condition and the surveillance showed good mobility. She opined that the plaintiff should avoid heavy lifting because of this condition, but other functional limitations were not warranted. (Id., p. 424).

     Plaintiff suffered from recurrent abdominal pain with nausea and vomiting through April, 2007, but a complete workup did not reveal any specific etiology. (Id.). Dr. Vasquez thought the condition to be IBS and side effects from narcotics. (Id., p. 425). Plaintiff's abdominal issues were virtually non-existent from September, 2007 through March, 2008, but then he had acute diarrhea thought to be colitis. Dr. Vasquez concluded that plaintiff's history of abdominal pain would not require functional limitations. (Id).

     Dr. Vasquez further reported that plaintiff denied any fatigue in 2008 and so this also

would not require any functional limitations. (Id.). Finally, with regard to plaintiff's history of tremors, plaintiff had no tremors by September, 2007 and no mobility issues or problems with his activities of daily living by January, 2008. Moreover, in March, 2008, he did not have any neurologic issues, and on March 14, 2008, he was undergoing physical therapy for neuropathy and pain, and getting healthier. Furthermore, the surveillance video showed him moving his hands repetitively without splints or devices. (Id., pp. 425-426).

Dr. Vasquez concluded that plaintiff's history of neuropathy would allow him to carry out a sedentary or light level occupation. (Id., p. 426). Moreover, the records did not identify any ongoing issues with medications that Dr. Vasquez believed would warrant restrictions for plaintiff. Based upon all of this, Dr. Vasquez concluded that plaintiff physically was capable of performing full-time sedentary or light level work. (Id., p. 427).

Dr. Lurie summarized plaintiff's psychiatric medical records, (Id., pp. 405-408), noting that, although plaintiff had been diagnosed with major depression and opioid dependence, there was no discussion of the diagnostic criteria for the diagnosis of depression. (Id., p. 409). In fact, it was unclear whether plaintiff still was suffering from depression or if the condition was appropriately treated with medication. The most recent mental status examination by Dr. Kahn in February, 2008, was quite benign and there was no evidence plaintiff had functional limitations resulting from his depression. (Id.). Dr. Lurie believed there was evidence plaintiff met the diagnosis of opioid dependence, but there was no evidence it caused functional limitations. (Id.). Therefore, Dr. Lurie concluded that there was no credible evidence for any functional/psychological limitations for plaintiff. (Id.). Dr. Lurie also noted that there was no credible evidence for any limitations due to plaintiff's medication use. (Id., p. 410).

Case 3:10-cv-00072-JPB   Document 30   Filed 11/10/11   Page 12 of 19   PageID #: 2140

On June 22, 2009, after a review of plaintiff's claim on appeal, Hartford upheld the decision to terminate benefits as of July 24, 2008. (Id., p. 352).

This suit followed.

## II.  Summary Judgment Standard

Rule 56(e) of the Federal Rules of Civil Procedure provides that "an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must– by affidavits or as otherwise provided in this rule– set out specific facts showing a genuine issue for trial.  If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party."

Rule 56 further provides that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); see **Celotex Corp. v. Catrett**, 477 U.S. 317, 322 (1986).  A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." **Anderson v. Liberty Lobby, Inc.**, 477 U.S. 242, 250 (1986).  Thus, the Court must conduct "the threshold inquiry of determining whether there is the need for a trial -- whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." **Anderson**, 477 U.S.at 250.

Additionally, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." **Matsushita Elec. Indus.**

***Co., Ltd. v. Zenith Radio Corp.***, 475 U.S. 574, 586 (1986).  That is, once the movant has met its burden to show absence of material fact, the party opposing summary judgment must then come forward with affidavits or other evidence demonstrating there is indeed a genuine issue for trial.  Fed. R. Civ. P. 56(c); ***Celotex Corp.***, 477 U.S. at 323-25; ***Anderson***, 477 U.S. at 248.  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." ***Anderson***, 477 U.S. at 249 (citations omitted).

### III.  Applicable Law

This case arises under ERISA.  "Where an ERISA plan confers upon its administrator discretionary authority in the exercise of its power, the administrator's denial of benefits is reviewed under an abuse-of-discretion standard." ***Booth v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan***, 201 F.3d 335, 341 (4th Cir. 2000).  Here, the Policy provides Hartford with "discretionary authority to determine . . . eligibility for benefits and to interpret the terms and provisions of the policy."  (Doc. 21-1, at 6).  This language unequivocally grants Hartford full discretionary authority regarding both eligibility determinations and interpretation of the applicable terms of the Policy and, accordingly, falls within the ambit of the Supreme Court's holding in ***Firestone Tire & Rubber v. Bruch***, 489 U.S. 101 (1989), and subsequent rulings from the United States Court of Appeals for the Fourth Circuit.  *See* ***Booth***, *supra*.  Therefore, Hartford's determination is subject to review under the abuse of discretion standard.

This deferential standard is unchanged by any potential conflict of interest, such as here where the administrator both funds the Plan and determines eligibility for benefits

under that Plan. This Circuit, applying the Supreme Court's holding in ***Metropolitan Life Ins. Co. v. Glenn***, 554 U.S. 105 (2008), applies the familiar abuse-of-discretion standard, even where an administrator is operating under such a conflict of interest. ***Champion v. Black & Decker Inc.***, 550 F.3d 353, 359 (4th Cir. 2008). *See also* ***White v. Eaton Corp. Short Term Disability Plan***, 308 Fed. Appx. 713, 717 (4th Cir. 2009) (unpublished opinion) ("[A] conflict of interest can no longer operate to reduce the deference given to a fiduciary's discretionary decision to deny benefits."). The level of deference afforded to the administrator's decision is not reduced and "any conflict of interest is considered as one factor, among many, in determining the reasonableness of the discretionary determination." *Id.*; *see also* ***Gilbert v. Medical Mut. of Ohio Co.***, 666 F.Supp.2d 625, 633 (S.D. W.Va. 2009) (Goodwin, CJ). Such other factors include, for example, (1) the language of the plan, (2) the adequacy of the materials considered to make the decision and the degree to which they support it, (3) whether the decision-making process was reasoned and principled, and (4) whether the decision was consistent with the requirements of ERISA. ***Champion***, 550 F.3d at 359.

"Under the abuse-of-discretion standard, we will not disturb a plan administrator's decision if the decision is reasonable, even if we would have come to a contrary conclusion independently. ***Ellis*** [***v. Metro. Life Ins. Co.***, 126 F.3d 228, 232 (4th Cir. 1997)]. Thus, we may not substitute our own judgment in place of the judgment of the plan administrator. *See* ***Berry v. Ciba-Geigy Corp.,*** 761 F.2d 1003, 1008 (4th Cir. 1985). To be held reasonable, the administrator's decision must result from a 'deliberate, principled reasoning process' and be supported by substantial evidence. ***Guthrie v. Nat'l Rural Elec. Coop.***

*Assoc. Long Term Disability Plan*, 509 F.3d 644, 651 (4th Cir. 2007); *Brogan v. Holland,* 105 F.3d 158, 161 (4th Cir. 1997)." *Williams v. Metroploitan Life Ins. Co.*, 609 F.3d 622, 630 (4th Cir. 2010).

"Under the standard of review appropriate for this case, plaintiff has the burden of demonstrating, based on the record, that [the defendant's] decision was unreasonable. See *Marcum v. Zimmer,* 887 F.Supp. 891, 896 (S.D. W.Va. 1995).  A decision to deny benefits is not an abuse of discretion simply because a different decision might have been logical or even better.  *Doe v. Group Hosp. & Med. Servs.,* 3 F.3d 80, 85 (4th Cir. 1993). A decision to deny benefits under an ERISA plan is reasonable, and therefore not an abuse of discretion, 'if it is the result of a deliberate, principled reasoning process and is supported by substantial evidence.'  See *Bernstein v. CapitalCare, Inc.,* 70 F.3d 783, 788 (4th Cir. 1985).  The quantum of evidence necessary to qualify as 'substantial' is not great; it must be more than a scintilla, but can be less than a preponderance.  *Ellis v. Metro Life Ins. Co.,* 126 F.3d 228, 235 (4th Cir. 1997)." *Havens v. Metropolitan Life Ins. Co.*, 2006 WL 2371117, *5 (S.D. W.Va. August 14, 2006) (Faber, CJ).

Under an abuse of discretion standard, a district court owes the administrator "a duty of deference" and plays a "secondary rather than primary role in determining a claimant's rights to benefits." *Evans v. Eaton Corp. Long Term Disability Plan*, 514 F.3d 315, 322 (4th Cir. 2008).

## IV.  Discussion

Based upon a careful review of the record in this case, this Court finds the decision to terminate long term benefits to be reasonable and not an abuse of discretion.  The

plaintiff contends that the decision was an abuse of discretion because (1) the plaintiff was found to be disabled by the Social Security Administration; (2) the defendant ignored the opinions of the treating physicians and, instead, chose to rely on the opinions of physicians who conducted record reviews and did not personally examine the plaintiff; and (3) on appeal the defendant did not obtain the opinions of Drs. Khan and Owunna.

With respect to the first issue, the fact that the Social Security Administration awarded disability benefits to the plaintiff is not determinative. At the time the benefits were awarded, plaintiff was also receiving disability benefits from Hartford. In ***Spry v. Eaton Corp. Long Term Disability Plan***, 326 Fed.Appx. 674, 680 (4th Cir. 2009) (unpublished), the Fourth Circuit found an award of social security benefits not to be determinative, stating that the "government's determination that Spry was disabled in November 2000 certainly did not require the Administrator to decide, based on updated information and additional medical opinions, that Spry remained unable to work more than five years later." In this case, the award was effective in January, 2004. As in ***Spry***, the final decision in this case was more than five years later.

With respect to the claim that Hartford ignored the opinions of the treating physicians, ERISA does not require plan administrators to give special deference to treating physicians' opinions. ***Black & Decker Disability Plan v. Nord***, 538 U.S. 822, 831-34 (2003). The record establishes that Hartford in fact did consider the opinions of plaintiff's treating physicians.

Finally, with respect to the contention that Hartford failed to obtain the opinions of the treating physicians, the record shows otherwise. It is important to note that based upon

the ERISA regulations, Hartford only had until June 26, 2009 to make a final determination on plaintiff's disability claim. 29 CFR 2560.503-1(i)(1)(i) and (i)(3)(i) (providing claim administrator with 45 days to make a determination on a claimant's appeal and an additional 45 days if additional time is needed under the circumstances, for a total of 90 days).  Because plaintiff and his treating physicians did not provide Hartford with documents requested during the appeal period, Hartford tolled the 90 days on March 12, 2009 to give them additional time to provide that information. After making several requests and not receiving any additional information from plaintiff's counsel, Hartford proceeded with its appellate review on May 12, 2009.  (Doc. 20, pp. 26, 435, 457, 455, 451).

Drs. Vasquez and Lurie made several attempts to contact Drs. Owunna and Kahn, but their calls were never returned prior to the time Hartford made a final determination on plaintiff's claim.  On May 29, 2009, Dr. Vasquez wrote the following with regard to her attempts to contact Dr. Owunna:

> **Communication with Dr. Owunna:**  I called Dr. Owunna on 5/26/09 at 10:50 AM.  He answered the phone.  I communicated the reason for my call. He said he was too busy to talk and would call me back.  I again called on 5/27/09 at 10:40PST.  I was told he was with patients and I left a detailed message on [his] personal voice mail.  I again called on 5/28/09 at 6:36 AM PST.  I again was told he was with patients and was transferred to his personal voice mail. I again left a message. I did not receive a call back from Dr. Owunna.

(Id., p. 423).

Similarly, on that same date, Dr. Lurie wrote the following with regard to his attempts

17

to contact Dr. Kahn:

> **Attempts to reach AP:** On 5/15/09, at 1:45 p.m. I left a secretarial message with Sherry for Dr. Shahnoor Kahn [for] him to call me back.  On 5/19/09 at 4:30 p.m. I left a voicemail message for Dr. Kahn.  On 5/26/09, I left a secretarial message with Sherry of Dr. Kahn's office for him to call me back.  He never returned my call.

(Id., p. 408).

In response, the plaintiff submitted two exhibits, which this Court has stricken from the record of this Court, since they were not part of the administrative record.  These letters, written after this case was filed, state that both Drs. Kahn and Owunna ultimately called back and were told that the physicians no longer needed to speak with them.  The letters are silent as to when the return calls were made, which may have been after Drs. Vasquez and Lurie submitted their reports to Hartford or even after Hartford completed its review.

In addition, it is noteworthy that at no time did plaintiff's counsel submit any reports from Drs. Kahn and Owunna to Hartford.

## V.  Conclusion

For the reasons stated above, Defendant Hartford Life and Accident Insurance Company's Motion for Summary Judgment **(Doc. 21)** is **GRANTED** and this case is **DISMISSED** from the docket of this Court.  The Clerk is further **DIRECTED** to enter a separate judgment in favor of the defendant.

It is so **ORDERED**.

The Clerk is directed to transmit copies of this Order to all counsel of record herein.

**DATED**: November 10, 2011.

JOHN PRESTON BAILEY
UNITED STATES DISTRICT JUDGE